UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | NO. 4:18 CR 00745 RWS |
| BARBARA "BASIA" SKUDRZYK, a/k/a Barbara "Basia" Najarro, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

Comes now the United States of America, by and through Jeffrey B. Jensen, United States Attorney for the Eastern District of Missouri, and Hal Goldsmith, Assistant United States Attorney for said District and, for its Sentencing Memorandum, states to this Honorable Court as follows:

1. By any standard or measure, defendant Skudrzyk's criminal conduct calls for a significant punishment. Application of the United States Sentencing Guidelines here advises a sentence of 33 – 41 months' imprisonment. This is based upon defendant's substantial and lengthy period of criminal conduct here, the significant loss to the victim university, and defendant's abuse of her position of trust with the victim university.

2. Title 18, United States Code, Section 3553(a) sets out the factors this Court should consider in fashioning an appropriate sentence. The first such factor to be considered is the nature of the offense, 18 U.S.C. 3553(a)(l). In this case, defendant was the longtime Business Director for the Division of Medical Education within Washington University's Department of Internal Medicine, where defendant oversaw the business operations of the Division. Needless to say, Washington University and the physicians within the Division trusted defendant completely, and relied upon her to handle the important day to day operations of the Division. Defendant was paid

1

well by Washington University, received generous benefits such as family health care, life insurance, paid holidays and vacation time, and an employee retirement savings plan with substantial contributions by Washington University. Through her conduct, she took advantage of her position and the generosity of Washington University, and embezzled almost $400,000. This was not an isolated incident, as her criminal conduct began soon after she became the Business Director, and continued week after week, month after month, and year after year for *almost ten (10) years*. Further, defendant's criminal conduct involved *three separate schemes* to defraud Washington University throughout those ten (10) years.

      a.      One of her schemes involved her creation, submission, and self- approval of false invoices to the University. These false invoices, purportedly for services rendered to the University, were in reality for services, work, and personal items for her own benefit. Defendant submitted false invoices in order to conceal purchases of jewelry, home repairs, appliances, meals, and other personal items. Defendant was so brazen as to falsely bill her own divorce attorney's fees to the University by way of false invoices. The total obtained by defendant through this false invoice scheme was approximately $155,000. The second of her schemes involved the fraudulent purchase of Visa gift cards at the Washington University bookstore purportedly for distribution to medical residents training at the University. Defendant used the names of co-employees to make these purchases without the knowledge of those co-employees, and forged the co-employees' signatures on the purchase receipts. Thus, defendant placed those co-employees at risk and jeopardy relative to those fraudulent transactions. Defendant had these gift card purchases charged to the Division of Medical Education, but used these Visa gift cards solely for her own personal use. The total obtained by defendant through the fraudulent purchase and use of these Visa gift cards was approximately $140,000. It is significant to note that, in order to conceal the gift card

fraud scheme, defendant charged the purchases to approximately 100 different Washington University internal accounts.  Finally, defendant engaged in a third scheme to obtain travel for herself and her family, again creating, submitting, and self-approving false invoices which reflected the travel as purportedly for the business of the University.  Defendant, often with her children, travelled to destinations including, but not limited to: West Palm Beach, Florida; Phoenix, Arizona; New York, New York; Bangkok, Thailand; Krakow, Poland; Toronto, Canada; and Munich, Germany.  Defendant actually went on two of these fraudulently billed trips, to Bangkok with her children and to Poland by herself, *after* she had been fired by the University, but *before* the University or law enforcement had fully identified and investigated this third scheme.

        b.     Defendant's various schemes remained undetected by the University due to her position of authority, the false invoices defendant submitted, her forgery of other employee signatures on purchase records, and her ability to manipulate the internal business records of the University.  As to the gift card scheme, her effort to conceal her criminal conduct was so extensive as to include her creation of a detailed, color coded spreadsheet on her work computer purporting to detail the distribution of her falsely obtained and used gift cards.  Despite the detail contained within this spreadsheet, all of the information as to the purported distribution of those gift cards was false, and intended solely as cover should her criminal conduct be detected.  In fact, when she was first apprehended by Washington University law enforcement officers relative to the gift card scheme, she falsely denied her criminal conduct, and pointed the officers to these records maintained on her computer which would purportedly "prove her innocence."  The mere fact that defendant maintained such false records, in case she was caught, evidences the fact that she clearly knew and understood that her conduct was wrong and illegal from day one of her scheme.

        c.     It is important to note that, but for a clerical error at the Washington

University bookstore, it is highly likely that defendant would not have been caught. During early June, 2018, defendant made one of her regular fraudulent purchases of $1,000 in Visa gift cards (10 gift cards valued at $100 each) at the Washington University bookstore. Defendant purchased the gift cards under the name of a subordinate employee, defendant forged that employee's signature on the purchase receipt, and defendant had the bookstore bill the University for the charges. The bookstore mistakenly double billed the transaction to the Division of Medical Education, and telephoned the employee whose name defendant had used for the purchase to inform her that a credit would be issued to account for the double billing. That employee, of course, knew nothing of the transaction, and when the bookstore then pulled the security camera film, defendant was positively identified by members of the Division as having made the gift card purchase using the other employee's name. Those fraudulently purchased gift cards were traced, and it was learned that defendant had used one of the gift cards the very same evening of the purchase at a local Walgreen's store for personal items unrelated to her work at the Division.

        d.    When all of the facts and circumstances are considered here, defendant's criminal conduct has to be viewed as substantial and egregious. As the FBI Special Agents and Postal Inspectors conducted their investigation and interviewed the various service providers paid through the false invoice scheme, one after the other admitted that the services they had provided defendant were not for the University, but were in fact personal services for defendant. They had not seen the false invoices defendant had submitted to the University. When they had questioned defendant as to why they were being paid with checks directly from Washington University for her personal services, she made false representations to them, including, "I withdrew funds from my Washington University retirement account," or "I received a bonus from Washington University," etc. All of her false statements were aimed at further concealing her scheme to defraud the

4

University.

        e.      Put simply, defendant is a con; she conned the physicians who oversaw the Division, she conned her co-workers, she conned the companies and individuals who provided her with personal services and personal items, and she conned her family and friends. She tried to con law enforcement when her gift card scheme was first uncovered, and might have been successful but for the mounting evidence against her, and the discovery of the other fraud schemes. Her supervisors and co-workers refused to believe that defendant was engaged in criminal conduct when first interviewed by law enforcement, an indication of just how conned they were, and how trusting they were of defendant. It boggles the mind to consider the substantial amount of time defendant took in concocting and carrying out her scheme; the creation of tens and tens of false invoices, the creation and maintenance of the false gift card spreadsheet, the trips to the bookstore, and the constant creation and use of false stories. All time taken away from her actual duties and responsibilities as Business Director of the Division of Medical Education. Attached hereto as Exhibit A is a January 24, 2019 victim impact statement from the Washington University School of Medicine, authored by Drs. Fraser and Blanchard, and Finance and Administration Executive Director Steven Reynolds. The letter speaks for itself, but clearly, defendant's criminal conduct has had a devastating effect on the Division and, more importantly, on the Division's employees who worked with and under the defendant. Also attached as Exhibit B is a February 20, 2019 victim impact statement from Washington University, authored by the Vice Chancellor and Chief Financial Officer Amy Kweskin. This letter also describes the short term and, unfortunately, the long term harmful effect defendant's criminal schemes will have on the University and the Division of Medical Education. These letters from the victim University and Division of Medical Education are included for the Court's further reference regarding the devastating nature of defendant's

several fraud schemes.

3. This Court's sentence should also afford adequate deterrence to criminal conduct, 18 U.S.C. 3553(a)(2)(B). As stated previously, this defendant was the longtime Business Director for a highly respected Division of Washington University's School of Medicine. She abused that position of trust in carrying out her various schemes and theft of funds. This Court should fashion an appropriate sentence and punishment not only to deter this defendant from future criminal conduct, but in order to deter other individuals in similar trusted management positions from committing similar crimes. Unfortunately, one need only look to the many recent prosecutions right here in the Eastern District of Missouri involving internal employee schemes and embezzlements to grasp the significance of these types of crimes, and the need for adequate punishment to deter these type of defendants and others.

4. As in all cases where a defendant has family and, particularly, children, the harmful impact of this defendant's criminal conduct will also be felt by them, consequences which should have been considered by defendant during the almost ten (10) years of her criminal schemes. This defendant not only stole from the University, but without any apparent second thought, she used those stolen funds to support a lifestyle for herself and her children which was based on a fraud. She took her children on expensive foreign vacations, all with the proceeds of her fraudulent conduct, including the last trip to Bangkok, taken after she was fired. As this Court stated at the recent sentencing hearing in *United States v. Mitchell Davis*, 4:17-CR-573 RWS, "No one stands where [defendant] stands at this moment without having a parent, a sibling, a spouse, or a child that will be affected by the conduct. That should have been a factor that each individual should have considered before they found themselves in these circumstances. In fact, the guidelines, when

they were mandatory – and it's still written in Chapter 5, the Court is not to consider family circumstances in fashioning a sentence.  That's not to say the Court's unsympathetic.  It does have empathy for the situation each individual finds itself, but it doesn't make a specific defendant unique in that regard."  It is the government's position that defendant's family situation is not a valid basis under the facts and circumstances presented here for leniency from this Court.  Similarly, if defendant is in need of mental health treatment, that should not be the determinative factor considered by this Court in fashioning an appropriate sentence.  Again, as this Court stated in the October 10, 2018 Mitchell Davis sentencing hearing, "Treatment is certainly *a* factor, but it's not *the* factor….  I'd tell you that a significant number of individuals who stand where [defendant] stands come in this room with a diagnosed mental issue.  …it's in the double digits a percentage of the population at the Bureau of Prisons that has already been diagnosed with a significant mental disease or defect.  But that's not *the* factor.  It's *a* factor.  Treatment is *a* factor."

     5.     Defendant has an advisory guideline sentence under the United States Sentencing Commission Guidelines of 33-41 months in prison.  The government submits that there is no basis whatsoever in the law or the underlying facts and circumstances here that would justify a downward variance to a sentence less than the advisory guideline sentence.  It is the government's position that justice and fairness require such a sentence in this case.  Such a sentence by this Court will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for defendant's criminal offenses as is required by 18 U.S.C. 3553(a)(2)(A).

     WHEREFORE, the United States of America prays that this Honorable Court sentence defendant to a term of imprisonment within the advisory sentencing guidelines as appropriate under the facts and circumstances presented here, and for such other relief as this Court deems

7

appropriate and just under the circumstances.

                                      Respectfully submitted,

                                      JEFFREY B. JENSEN
                                      United States Attorney

                                      *s/Hal Goldsmith*
                                      HAL GOLDSMITH #62501
                                      Assistant United States Attorney
                                      111 S. 10th Street, Room 20.331
                                      St. Louis, Missouri 63102
                                      (314) 539-2200

## **CERTIFICATE OF SERVICE**

       I hereby certify that on March 1, 2019, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the counsel for defendant.

                                        /s/ Hal Goldsmith
                                        HAL GOLDSMITH
                                        Assistant United States Attorney